109 F.Supp.2d 1102 (2000)
Norville L. PRIEST, Plaintiff,
v.
Kenneth S. APFEL, Commissioner of Social Security, Defendant.
No. 4:99CV885 LMB.
United States District Court, E.D. Missouri, Eastern Division.
July 7, 2000.
*1103 *1104 Frank J. Niesen, Jr., Niesen Law Office, St. Louis, MO, for Norville L. Priest, plaintiff.
Maria C. Sanchez, Office of U.S. Attorney, St. Louis, MO, for Social Security Administration com Kenneth S. Apfel, defendant.

MEMORANDUM
BLANTON, United States Magistrate Judge.
This is a proceeding under 42 U.S.C. § 405(g) for judicial review of the Defendant's final decision denying Plaintiff Norville Priest's applications for disability insurance benefits under Title II of the Social Security Act and for supplemental security income benefits under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties under 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint (Doc. No. 11), and Defendant has filed a Brief in Support of the Answer (Doc. No. 12).

Procedural History
On December 18, 1996, Plaintiff filed applications for disability insurance and supplemental security income (SSI) benefits. (Transcript 131-33, 290-93.) Plaintiff alleged disability beginning on April 29, 1996 due to back problems, an injured right hand and an eye problem. (Tr. 290.) The applications were denied initially, (Tr. 90-93, 301-05), and on reconsideration, (Tr. 85-88, 295-300). Following a hearing held on November 5, 1997, an Administrative Law Judge (ALJ) found that Plaintiff was not disabled by a decision dated February 26, 1998. (Tr. 13-24.) Plaintiff thereafter filed a request for review with the Appeals Council of the Social Security Administration (SSA). (Tr. 3-6.) The Appeal Council denied Plaintiff's request for review on April 1, 1999. (Tr. 3-5.) Therefore, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (1999).

Evidence Before the ALJ

A. ALJ Hearing

The administrative hearing was held on November 5, 1997. Plaintiff was present and was represented by counsel. (Tr. 27.) At the time of the hearing, Mr. Priest was 50 years old and lived at home with his wife. (Tr. 28.)
Plaintiff testified first about his schooling and prior work experience. Plaintiff completed the ninth grade. (Tr. 29.) After school, he served two years in the Army Infantry. (Tr. 29-30.) Plaintiff last worked in June of 1996 and had quit working because of a back injury at work. He was awarded permanent partial disability payments for this injury in connection with a worker's compensation claim in Arizona. (Tr. 31-32.) Plaintiff was employed as a prison guard for a brief period of time, but primarily he held "factory positions." (Tr. 33.) In the early 1990's, Plaintiff did not work for two years because he was helping his mother and father. (Id.)
Plaintiff next discussed his alleged medical conditions, as well as the related physical limitations. He indicated that he suffered an injury to his right forearm two years before the hearing. His arm was "crushed," and he still has plates and screws in his arm. Plaintiff testified that he has difficulty "moving it." (Tr. 33.) He also has problems with his right shoulder which began after he broke his right forearm. He indicated that he can hardly move his right shoulder on some days. (Tr. 42.) Plaintiff is right-handed. (Tr. 34.)
Plaintiff also has a vision impairment. He stated that he could not see out of his right eye, a condition which has lasted for the past 12 years. Plaintiff had cataract surgery on his left eye in July 1997, and *1105 hoped to have the same surgery on his right eye in the near future. (Tr. 34-35.)
Plaintiff had lower back surgery in June 1996 as a result of the work-related injury. (Tr. 35.) He indicated that his treating physicians for this condition did not recommend any physical therapy or exercises after the surgery. (Tr. 38-39.) Now, he is "bothered" by any lifting, bending or stooping as a result of the back injury. When asked what happens when he tries to lift something, Plaintiff stated: "It bothers my back and also if ... I lift anything heavy I have to go lay down...." (Tr. 37.)
Plaintiff also complained of constant tingling in his legs and arms, with additional tingling in other areas of his body on occasion. Mr. Priest also has headaches, allegedly occurring every day. (Tr. 40.) The headaches began occurring shortly after his back surgery in June 1996, but Plaintiff admitted that he has not informed any doctors about the headaches. Plaintiff stated that at times he takes 12-18 aspirin a day. The aspirin does not relieve all of his pain. (Tr. 40.) Plaintiff was prescribed medication for his back condition, but he stopped taking it because it made him sick. (Tr. 41.)
His doctors have limited him to lifting ten pounds due to his back condition. (Tr. 37.) He can stand for only 15-20 minutes before he has to sit down or change positions. Plaintiff is restricted to walking a couple of blocks. He cannot walk further because of the tingling in his arms and legs. (Tr. 38.) Plaintiff cannot squat without pain. He can sit 15-20 minutes before having to get up and move around. He is limited to sitting for short periods of time because of his back pain. (Tr. 47.) He is able to climb the three steps to his home by using the handrails without difficulty. (Tr. 48.) He cannot run. (Tr. 54.) Plaintiff does not drive because of his vision impairment. (Tr. 47.)
Plaintiff acknowledged that he has not sought medical treatment on a regular basis. He attributes this primarily to a lack of insurance. Mr. Priest has attempted to get treatment in connection with his worker's compensation claim, but his requests have been denied. (Tr. 50-51.)
Plaintiff also testified about his daily activities. He shops, performs yard work and cleans the house, but needs some assistance from others to complete these tasks. He does not cook. Plaintiff spends a typical day "watching television and laying around." (Tr. 48.) He gets up at around 9:00 or 10:00 in the morning and retires at 11:30 or 12:00. His back pain, tingling in the legs and arms, and the headaches force him to lie down a couple of times a day, for a total of four to five hours. (Tr. 53-54.) Mr. Priest stated that he leaves the house approximately once or twice a day, usually to visit his relatives or grandchildren. His stepdaughter lives just down the street, and she and her family come by often to help Plaintiff and his wife. He does not belong to any clubs, organizations or churches. (Tr. 49.)
James Israel, a vocational expert (VE), also testified during the administrative hearing. The expert initially asked Plaintiff to explain his prior employment as an assembly line worker. Plaintiff indicated that he assembled "small stuff" and put the items into boxes with his hands. Plaintiff held this position in 1989 and 1990 for Five Star Temporary Agency. (Tr. 55.)
The ALJ then asked the vocational expert to assume a hypothetical individual with the Plaintiff's age, education, and prior work experience and further to assume that the individual was limited to lifting and carrying 10 pounds; could not perform frequent or vigorous bending at the waist or frequent stooping or squatting; and was precluded from work requiring binocular vision, because he was blind in one eye. The VE testified that such an individual could not perform any of Plaintiff's past relevant jobs as he had actually performed them. The VE felt that the jobs of factory work and assembly line work as Plaintiff had performed them required agility and/or binocular vision, qualifications that *1106 could not be fulfilled by the given hypothetical individual. (Tr. 56-57.)
However, the VE was of the opinion that such a hypothetical individual could perform Plaintiff's past relevant work as an assembly line worker as that job is usually performed in the national economy. He testified that binocular vision would not preclude work assembling larger parts. The VE testified that 4500 of the described jobs exist in the state of Missouri and that 211,500 such jobs exist in the national economy. The expert also testified that the given hypothetical individual could perform jobs that are similar to assembly line work, including product inspector, checker and examiner. Five hundred such jobs exist in the state of Missouri. (Tr. 56-58.)
The VE further testified that an individual having the same limitations described above, with the additional restriction of a need for a sit/stand option, could perform assembly line work. At least 1,125 such jobs exist in the state of Missouri. The VE described these jobs as unskilled labor, requiring simple, routine and repetitive work. (Tr. 60-61.)
When asked to add a restriction requiring the hypothetical individual to lie down during the day, the VE testified that no jobs existed that could be performed by the individual. (Tr. 59.) He also testified that the hypothetical individual could not perform work as an assembler if he had difficulty with stiffness and tingling in the right arm caused by repetitive movements. Tingling and numbness in the left arm caused by repetitive movement would also render the individual unable to perform assembly line work. (Tr. 61.)

B. Relevant Medical Records

Plaintiff injured his right forearm in a work-related accident on June 23, 1994. He suffered comminuted fractures in the right distal radius and ulna. Doctors repaired the fractures by surgically implanting fixation apparatus. An x-ray of the right radius and ulna taken on October 3, 1994 showed callus formation at the fracture site. (Tr. 266-68.)
Plaintiff was seen by Aniceto C. Gonda, M.D. on March 3, 1995 for an initial visit. Dr. Gonda noted the right arm injury. Physical examination was largely unremarkable. Dr. Gonda diagnosed mild shortness of breath, and he wanted to rule out chronic obstructive pulmonary disease. (Tr. 235.) A report reflecting a chest x-ray performed on March 3 showed negative results for acute process. (Tr. 236.)
Bryan K. Matanky, M.D. saw Plaintiff on March 23, 1995, which was nine months after the injury to his right arm. Plaintiff reported "doing much better." He was undergoing aggressive physical therapy on his own and reported that range of motion was "much improved." Plaintiff reported occasional stiffness, usually occurring in the morning, but stated that the stiffness will work out during the day. Plaintiff was working full duty status at that time. Strength testing showed 40 pounds on the right arm and 70 pounds on the left. Examination revealed "great improvement with range of motion since the last visit." A "fairly reasonable," but slightly decreased, grip strength was also noted. Dr. Matanky felt that Plaintiff had reached a fairly stationary status in his medical improvement. The physician assessed an approximate 5% disability due to slightly decreased grip strength and slightly decreased range of motion, but noted that both strength and range of motion were within functional levels. Aggressive, home physical therapy on a daily basis was recommended. (Tr. 266.)
A notice from the Industrial Commission of Arizona, dated August 7, 1995, reflects Plaintiff's worker's compensation claim related to the right forearm injury. The notice indicates a finding of a 5% impairment in his right arm as a result of the injury and awards partial disability benefits. (Tr. 118.) A subsequent Compromise and Settlement Agreement was approved by an Administrative Law Judge of the Industrial Commission on December 20, 1995, but *1107 the record does not contain the details of this agreement. (Tr. 123-25.)
Plaintiff was examined by Deborah Trajanowski, M.D. on August 7, 1995 for an independent medical evaluation regarding his degree of disability from the prior right arm injury. During the examination, Plaintiff reported that he had been back to "light work" since August of 1994. His current complaint was an inability to make a fist and use his hand normally and occasional aches and pains in the wrist area. Clinical examination of the right arm revealed normal elbow motion. Limitation in the wrist area was observed, with flexion to 50 degrees and extension to 20 degrees. He had difficulty pronating and supinating due to stiffness.[1] Dr. Trajanowski wanted to review current x-rays and wanted Plaintiff to undergo a functional capacity evaluation before offering her opinion of the degree of disability. (Tr. 243.)
Plaintiff returned to Dr. Gonda on April 9, 1996. Notes from this date reflect that Plaintiff went to the emergency room the previous day with complaints of numbness and tingling on the right side of his body. (Tr. 232, 281.) Plaintiff denied further dizziness, numbness or tingling, but reported mild neck pain and back pain. He also denied headaches or an elevated fever. The assessment was transient ischemic attack (TIA)[2], neck pain, back pain and fatigue. Dr. Gonda ordered further testing. (Tr. 232, 281.) X-rays taken during the emergency room visit indicated a stable cardiomegaly,[3] without acute infiltrate and moderate degenerative changes in the thoracic spine. (Tr. 233.)
Plaintiff saw Dr. Gonda on April 18 for follow-up regarding his laboratory tests. Progress notes reflect that Plaintiff was recently discharged from the hospital following a possible TIA. (Tr. 229, 279.) X-rays of the cervical and lumbar spine showed degenerative arthritis.[4] (Tr. 229, 231, 279, 289.) A carotid Doppler showed mild, but insignificant, stenosis. (Tr. 229-30, 279-80.) Dr. Gonda suggested that Plaintiff continue with conservative treatment, using nonsteroidal anti-inflammatory drugs. (Tr. 229, 279.)
On April 29, 1996, Plaintiff injured his lower back at work while lifting 120 pounds of plywood from the floor to the table. (Tr. 94, 148, 256-57.)
R.E. Silva, M.D. examined Plaintiff on May 1, 1996. Progress notes reflect Plaintiff's complaints of neck pain, back pain and pain in the groin areas. Dr. Silva noted evidence of decreased range of motion in the neck with paresthesia[5] to the left arm. (Tr. 264.) Dr. Silva completed a return to work recommendation in connection with this visit. Dr. Silva stated that Plaintiff could perform light work, with no lifting of objects over five pounds, no pushing or pulling, no bending or stooping, and no prolonged walking or standing. The restrictions *1108 were in effect until a reevaluation to be performed on May 8. (Tr. 265.)
Plaintiff was seen by Dr. Silva on May 8. Plaintiff complained of constant tingling in both legs. Dr. Silva diagnosed a possible disc herniation and recommended a lumbar MRI and continued physical therapy. Plaintiff was prescribed naproxen, a nonsteroidal anti-inflammatory drug used to alleviate pain. See Physician's Desk Reference (PDR), 2631-32 (54th Ed.2000). Dr. Silva instructed Plaintiff to remain off work until a further recheck on May 16. (Tr. 260-61.) An MRI performed on May 9 showed a moderate sized central and left paramedium subligamentous disc protrusion at the L5-S1 level. Disc narrowing and disc dessication were also noted in the same location. (Tr. 258-59, 262.) Plaintiff underwent physical therapy on May 7th, 13th and 15th. Progress notes from the therapist reflect continued back pain. (Tr. 263.)
Plaintiff was seen by Mazen H. Khayata, M.D. for a neurosurgical consultation on May 20, 1996. Plaintiff reported injuring his back five weeks prior to the visit while lifting plywood from the floor to the table. After the injury, he began to experience low back pain with associated radiation down to the legs, on the left side more than the right, with radiation also to the foot. Physical therapy worsened the pain, and medications had not helped. Plaintiff also complained of numbness in the left thigh, radiating over the knee and down to the shin. Dr. Khayata noted a past medical history of a right shoulder injury, right arm crushing injury, and headaches. A previous cataract surgery in the right eye, with no vision in that eye, was also noted. After examination, the impression was persistent bilateral lumbar radiculopathy, the left greater than the right, secondary to a herniated disc at the L5-S1 area. Noting that conservative treatment had not helped, Dr. Khayata recommended surgery, specifically a discectomy, laminectomy and fusion. Plaintiff was advised that in the future, he would be unable to perform heavy work or lift more than 20 pounds. EMGs and nerve conduction studies were recommended to determine the cause of Plaintiff's numbness. (Tr. 256-57.)
Mark J. Perlow, M.D. performed a neuromuscular electrodiagnosis on June 4, 1996. Nerve conduction studies were normal. An EMG was abnormal, with results reflecting an L5 and possible S 1 radiculopathy on the left side. Clinical and radiological correlation was recommended. (Tr. 254.)
Plaintiff underwent back surgery on June 18th. Dr. Khayata performed a discectomy and laminectomy. Postoperatively, Plaintiff did well with relief of his leg pains. Examination revealed that motor strength was intact. At the time of his discharge on June 20, Plaintiff was taking motrin, soma and darvocet. (Tr. 246-48.) One week following the surgery, Plaintiff reported no more pain in his leg and that the numbness in his toes was intermittent and seemed to be improving. He had stopped taking all medication with the exception of darvocet. Progress notes reflect that Plaintiff had driven himself to the follow-up appointment without difficulty. (Tr. 245.)
Plaintiff's next visit with Dr. Khayata was on July 29, seven weeks after his back surgery. It was noted that Plaintiff had recovered "well." He reported good relief of his leg pains, but some continued soreness in his back. The prior numbness continued to improve, except when Plaintiff irritated it in a specific position. Examination revealed motor strength of 5/5. The progress notes from this date reflect that Plaintiff was moving from Arizona to St. Louis, Missouri. Dr. Khayata felt that Plaintiff needed to continue to avoid carrying anything heavy. He released Plaintiff to return to work on September 1, 1996 with a 20-pound weight lifting restriction. Because of persistent low back pain, Dr. Khayata gave Plaintiff a four percent partial total body disability. (Tr. 244.)
*1109 Plaintiff returned to Dr. Khayata on September 30, 1996. Progress notes reflect that Plaintiff had "some relief" of his leg pain, but recently began experiencing numbness in the saddle falling down to the legs. Dr. Khayata noted that this numbness was not present previously, even after the back surgery. Strength was intact. An MRI was recommended, and Plaintiff was instructed to avoid lifting heavy objects. (Tr. 242.)
During a November 11th visit with Dr. Khayata, Plaintiff complained of "some back pain" and "some tingling down to the left foot." He denied sharp shooting pains to the left foot. An MRI showed scarring in the operated sites, but did not reveal any new herniated discs. Dr. Khayata diagnosed residual low back pain and some tingling in the left foot. Plaintiff was restricted to lifting no more than 10 pounds. (Tr. 240.)
Plaintiff was examined by Michael J. O'Day, D.O. for a consultative evaluation on February 4, 1997. (Tr. 269-74.) Plaintiff reported problems with his back, right arm and eyesight. Regarding his back problem, Plaintiff stated that the surgery helped his left leg pain quite appreciably, but that his back was still tender at times. Coughing and sneezing does not exacerbate the pain in his low back or left leg, but Plaintiff does experience low back pain after prolonged standing, walking or frequent postural moves such as crouching. With regard to the right forearm injury, Plaintiff reported some reduced range of motion and possible loss of grip strength, but no problems with fine manipulatory skills. Numbness and tingling of the fingers were denied. Plaintiff also stated that he had a cataract removed from his right eye many years ago and that his vision decreased as a result. (Tr. 269-71.)
Physical examination revealed corrected vision of 20/200 in the right eye and 20/50 in the left. Grip strength on the right was 4-5/5 and was 5/5 on the left. Some stiffness was found in the wrist. Range of motion tests showed decreased motion for right wrist dorisflexion (45 degrees, with 60° being normal) and for palmar flexion in the right wrist (60°, with 70° being normal). A slightly decreased range of motion in flexion of the right shoulder (160° out of 180 degrees), abduction of the right shoulder (160° out of 180°), and supination of the right elbow (60° out of 80°) was also found. (Id.)
Neurological examination revealed deep tendon reflexes to be equal and symmetric in the arms and legs. Sensation in the legs was well-preserved. Plaintiff walked normally, with a normal associated arm swing. Dr. O'Day noted that Plaintiff's spine flexion and extension was slightly reduced (with flexion at 80 degrees, on a normal scale of 90°), that his left lateral flexion was slightly reduced (20° out of 25°), and that straight leg raising was slightly restricted (80° on both the right and left sides, with 90° being normal). (Id.)
Dr. O'Day diagnosed status post decompressive laminectomy of the lumbar spine with no current compressive neuropathy; status post open reduction and internal fixation of comminuted fractures of the right distal radius and ulna with some residuals being some decreased range of motion and supination; and status post lenticular cataract removal on the right eye with very decreased visual acuity. Dr. O'Day felt that Plaintiff should avoid dangerous heights and dangerous machinery because he lacks binocular vision. Furthermore, Dr. Day was of the opinion that Plaintiff could stand and walk a total of 6 to 8 hours a day with normal rest periods and that he could bend, stoop and crouch occasionally. He felt that Plaintiff could lift and carry 50 pounds on an occasional basis. (Id.)
In March 1997, Plaintiff was awarded worker's compensation benefits related to his back injury. The Industrial Commission of Arizona found that Plaintiff sustained a 3% general physical functional disability as a result of the injury. He was *1110 awarded permanent partial disability payments. (Tr. 94-98.)
Jack Hartstein, M.D. performed cataract surgery on Plaintiff's left eye on July 29, 1997. The procedure performed was phacoemulsification[6] with implantation of a foldable posterior chamber lens. (Tr. 275.)
The record contains a note from Dr. Khayata, dated October 14, 1997, indicating that Plaintiff was precluded from lifting more than 10 pounds because of his back condition. No other restrictions are noted. (Tr. 276.)

The ALJ's Decision
The ALJ made the following findings:
1. The claimant met the disability insured status requirements of the Act on April 29, 1996, the date the claimant stated he became unable to work, and continues to meet them through September 30, 1998.
2. The claimant has not engaged in substantial gainful activity since April 1996.
3. The medical evidence establishes that the claimant has residuals of a back injury and back surgery, impaired vision, and residuals of right upper extremity injuries; but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.
4. The claimant's complaints of disabling pain, impaired vision, and headaches are not supported by the evidence and are not credible.
5. The claimant has the residual functional capacity to perform the requirements of work except for lifting more than 10 pounds, which is an exertional limitation; and there are non-exertional limitations in that he is restricted to activities not requiring binocular vision which accommodate a need for a sit/stand option, and which do not requiring [sic] vigorous or frequent bending at the waist, or frequent stooping or squatting.
6. The claimant's past relevant work as an assembly line worker does not require performance of precluded work-related activities.
7. Vocational expert testimony and other evidence establish that the claimant's impairments do not prevent him from performing his past relevant work.
8. The claimant was not under a disability, as defined in the Social Security Act, at any time through the date of the decision.
(Tr. 15-16.) The ALJ's final decision reads as follows:
It is the decision of the Administrative Law Judge that, based upon the applications filed on December 18, 1996, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under sections 216(I) and 223, respectively, of the Social Security Act, and is not eligible for Supplemental Security Income under Sections 1602 and 1614(a)(3)(A) of the Act.
(Tr. 16.)

Discussion
Plaintiff argues that the decision of the ALJ finding him not disabled is not supported by substantial evidence. Specifically, he asserts that the ALJ failed to properly evaluate his subjective complaints of disabling pain. Plaintiff also contends that the ALJ erred in concluding that he could perform his past relevant work as an assembly line worker because the hypothetical proposed to the vocational expert did not properly reflect his restrictions.

A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. *1111 Chater, 94 F.3d 413, 416 (8th Cir.1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Mapes v. Chater, 82 F.3d 259, 262 (8th Cir.1996). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir.1998). It is not the court's task "to review the evidence and make an independent decision." See Mapes, 82 F.3d at 262. If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See id. The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir.1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir.1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir.1998). The analysis required has been described as a "searching inquiry." Id.

B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(I)(1)(a); 42 U.S.C. § 423(d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir.1997).
The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S.Ct. 2287, 2291, 96 L.Ed.2d 119 (1987); Fines v. Apfel, 149 F.3d 893, 895 (8th Cir.1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920(b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R. §§ 404.1520(c), 416.920(c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.
If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520(d), 416.920(d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520(d), 416.920(d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant is entitled to disability benefits *1112 only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

C. Credibility Determination

Plaintiff contends that the ALJ did not properly consider his allegation that he experienced disabling pain and limitations.
In rejecting Plaintiff's subjective complaints, the ALJ acknowledged his duty under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984). As a rule, although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so s/he "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of any medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322; see also Burress v. Apfel, 141 F.3d 875, 880 (8th Cir.1998); 20 C.F.R. § 416.929. Under Polaski, an ALJ must consider a claimant's prior work record, observations by third parties and treating and examining doctors, and claimant's appearance and demeanor at the hearing. 739 F.2d at 1322; see also Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir.1989). In evaluating the evidence of nonexertional impairments, the ALJ is not free to ignore the testimony of the claimant "even if it is uncorroborated by objective medical evidence." Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir.1996). It is well-established that in disability determinations, credibility assessments are left to the ALJ and not the courts. This court cannot "disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain." Browning v. Sullivan, 958 F.2d 817, 821-22 (8th Cir.1992).
Citing Isom v. Schweiker, 711 F.2d 88 (8th Cir.1983), Plaintiff asserts that the "Administrative Law Judge must find discrepancies between the medical records and testimony." To the extent that Plaintiff means to suggest that Isom requires the ALJ to find specific discrepancies between the administrative hearing testimony and the medical records, this is not correct. In Isom, the court recognized that "[a]n ALJ may disbelieve subject reports of pain because of inherent inconsistencies, so long as the disbelief is not based solely on the lack of objective medical findings." 711 F.2d at 90. This statement is consistent with Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.1984), although it is not as specific as the standard articulated in Polaski. The court notes that Isom was decided prior to the Eighth Circuit's decision in Polaski v. Heckler. To the extent that Isom contradicts the Polaski case, it will not be followed here because Polaski is the governing standard in this Circuit.
In this case, the ALJ recognized that Plaintiff has serious medical conditions with some associated limitations, but nevertheless found Plaintiff's allegations of disabling pain and his allegations of certain restrictions to not be credible. In doing so, the ALJ acknowledged his duty under Polaski v. Heckler. The ALJ then proceeded to list his reasons for discounting Plaintiff's subjective complaints. He noted the lack of objective medical findings showing a disabling condition, the fact that Plaintiff was not consistent regarding his alleged disabling condition, and that Plaintiff's work record reflected a lack of strong *1113 motivation to work. The ALJ also noted that Plaintiff performed housework and that he did not take prescription medication for pain relief, both factors he believed weighed against Plaintiff's complaints of pain. (Tr. 12-13.)
An independent review of the record supports the ALJ's conclusion that the objective medical evidence does not support a finding of disability. The medical evidence shows that Plaintiff was released to return to work following the injury to both his right forearm and his lower back. While there is indication in the record that Plaintiff suffers some decreased range of motion in his wrist and back as a result of the injuries, neither his treating physicians or Dr. O'Day, a doctor who performed a consultative examination, believed that Plaintiff could not perform any work. Indeed, assessments made by Plaintiff's treating physicians in connection with his worker's compensation claims reflect that the residuals of the injuries do not render Plaintiff completely disabled. Dr. Silva, Plaintiff's doctor for the forearm injury, felt that he suffered a 5% permanent disability as a result of the injury. Dr. Khayata, Plaintiff's back surgeon, assessed a 4% permanent disability in connection with Plaintiff's back condition. Moreover, the only restriction placed on Plaintiff by Dr. Khayata was that he could not lift over 10 pounds, which was accepted by the ALJ. Particularly relevant here is the consultative report of Dr. O'Day reflecting that Plaintiff described his back pain as "still tender at times," which does not suggest complete disability.
There is little medical support in the record reflecting Plaintiff's allegations of disabling stiffness, tingling and numbness in his right shoulder. At the administrative hearing, Plaintiff testified that he began experiencing right shoulder problems after he broke his right forearm. He claimed that on some days, he can hardly move his right shoulder. (Tr. 42.) However, there is no indication in the record that Plaintiff complained of any right shoulder problems to either of his treating physicians.[7] Indeed, while Dr. O'Day's physical examination revealed a slightly decreased range of motion in the right shoulder, there is no indication that Plaintiff reported right shoulder problems. Claims of disabling pain may be discredited when the record reflects minimal or conservative medical treatment. See Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (minimal treatment of back pain and migraine headaches was inconsistent with claims of disabling pain).
In rejecting Plaintiff's subjective complaints of pain, the ALJ considered the fact that Plaintiff did not take prescription medication for pain relief. As Plaintiff reported only taking aspirins for pain relief, this was an accurate observation and a valid consideration for a credibility determination. See Ostronski v. Chater, 94 F.3d 413, 419 (8th Cir.1996) ("[Claimant's] complaints of disabling pain and functional limitations are inconsistent with her failure to take prescriptive pain medication or to secure regular medical treatment for her symptoms"); Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir.1996) (an absence of long-term pain medication use is a factor in determining whether claimant's complaint of severe pain is credible); Benskin v. Bowen, 830 F.2d 878, 884 (8th Cir.1987) (failure to seek regular treatment or obtain pain medication inconsistent with complaints of disabling pain).
Plaintiff finds fault in the ALJ's discussion of his work record because the ALJ did not acknowledge that he was taking care of his sick parents during two years that he did not work. In discrediting Mr. Priest's subjective complaints of pain, the ALJ considered his work and earnings record. *1114 Specifically, he stated: "The claimant's Earnings Record does not reflect an excellent record of work earnings such as would support a conclusion that the claimant has a strong motivation to work. According to the claimant's work record, his annual earnings have never exceeded $17,000 per year and for most years they were under $10,000. He had zero earnings in 1991 and 1992. With such earnings, the claimant would have a minimal motivation to work." (Tr. 13.)
The ALJ's summary of Plaintiff's work and earnings record is accurate.[8] Consideration of his work record was entirely permissible in this instance. The ALJ simply considered Plaintiff's inconsistent work record as one factor in discrediting his complaints of pain. A review of Plaintiff's earnings record indicates that his yearly earnings fluctuated considerably, over a 20 year time span, with a low of nothing to a high of about $ 16,000. For ten out of his last fifteen years of employment, he earned less than $5,000. An "unimpressive work history" is a valid consideration in rejecting subjective claims of pain. Siemers v. Shalala, 47 F.3d 299, 302 (8th Cir. 1995). The mere fact that the ALJ did not discuss Plaintiff's proffered reason for not working during 1991 and 1992 is not determinative. Even excluding these two years, Plaintiff's work and earnings record reflected inconsistent and low earnings.
Plaintiff also argues that the ALJ erred in relying on Plaintiff's ability to perform housework in his credibility determination. As Plaintiff argues, the Eighth Circuit has recognized that the ability to perform light housework provides little support for the finding that a claimant can perform full-time competitive work. See Hogg v. Shalala, 45 F.3d 276, 278 (8th Cir.1995). Here, however, the fact that Plaintiff could do housework was simply one factor considered by the ALJ. Although daily activities, such as cleaning, are not dispositive on the issue of disability, they are a relevant factor which must be considered. See Burress, 141 F.3d at 880; Walters v. Apfel, 998 F.Supp. 1078, 1087 (E.D.Mo.1998) (citing Wilson v. Chater, 76 F.3d 238, 241 (8th Cir.1996)).
In sum, as demonstrated by the above discussion, the ALJ properly followed Polaski in rejecting Plaintiff's subjective complaints of pain and limitations. As recognized above, this court cannot "disturb the decision of an ALJ who seriously considers, but for good reasons explicitly discredits, a claimant's testimony of disabling pain." Browning, 958 F.2d at 821-22.

D. Assessment of Plaintiff's Residual Functional Capacity

Plaintiff next contends that the ALJ's finding that Plaintiff can perform his past relevant work is not supported by substantial evidence. In particular, he argues that the ALJ erred in assessing his residual functional capacity because he failed to recognize a limitation related to stiffening in his right arm.[9]
*1115 In determining whether Plaintiff could perform past relevant work at the fourth level of sequential analysis, the ALJ first defined Plaintiff's residual functional capacity. The ALJ found that Plaintiff cannot lift or carry more than 10 pounds, is restricted to activities not requiring binocular vision, is restricted to activities accommodating a need for a sit/stand option, and finally cannot perform a position requiring vigorous or frequent bending at the waist or frequent stooping or squatting. (Tr. 14.) Relying primarily on the testimony of the vocational expert, the ALJ then concluded that Plaintiff could perform his past relevant work as it is frequently performed. In so concluding, the ALJ cited the VE's testimony reflecting the existence of 1,125 assembly line jobs and 100 similar checker jobs in the state of Missouri which could be performed by someone with Plaintiff's residual functional capacity. (Tr. 14.)
Preliminarily, the court will address Plaintiff's suggestion that the decision of the ALJ was improper because he found Plaintiff not disabled based on a determination that Plaintiff could perform his past relevant work "as generally required to be performed by employers in the national economy." Social Security Ruling 82-61 provides that a disability claimant will be found capable of performing past relevant work when it is determined that s/he retains the residual functional capacity to perform: (1) "the actual functional demands and job duties of particular past relevant jobs" or (2) "the functional demands and job duties of the occupation as generally required by employers throughout the national economy." The Eighth Circuit Court of Appeals has adopted and approved the test established by S.S.R. 82-61. See Martin v. Sullivan, 901 F.2d 650, 652-53 (8th Cir.1990) (rejecting claimant's argument that an ALJ must find that a claimant can actually perform prior work as s/he had previously performed it); Evans v. Shalala, 21 F.3d 832, 833 (8th Cir.1994); Jones v. Chater, 86 F.3d 823, 826 (8th Cir.1996).
Thus, to affirm the ALJ's decision this court must determine whether substantial evidence exists to support the finding that Plaintiff can perform his past relevant work as an assembly line worker as that job is generally performed throughout the national economy. Key to this analysis is whether the ALJ properly defined Plaintiff's residual functional capacity (RFC).
Plaintiff argues that the ALJ's assessment of his RFC was wrong because he did not include a limitation related to the right arm. Plaintiff claims that there is evidence in the record reflecting that Plaintiff experiences stiffening and tightening in the right arm on repetitive movement.
At the administrative hearing, Plaintiff testified that his arm was "crushed" and that he still has plates and screws in his arm. He stated that he has difficulty "moving it." (Tr. 33.) Plaintiff also testified that he has problems with his right shoulder which began after he broke his right arm. He indicated that he can hardly move his right shoulder on some days. (Tr. 42.) The consultative examination by Dr. O'Day, as well as the records of Plaintiff's treating physicians, reflect a decreased range of motion and some stiffness in the wrist area. See Tr. 266 (noting that Plaintiff reported occasional stiffness in the morning, but that the stiffness would work out during the day); Tr. 243 (examination by Dr. Trajanowski reveals decreased range of motion and difficult with wrist movements due to stiffness); Tr. 269-74 (Dr. O'Day's examination showed reduced range of motion in the wrist). Dr. O'Day also found a slight restriction in the right shoulder area. (Tr. 269-74.) No specific mention is made in the progress notes of any complaints by Plaintiff of tingling or stiffness in his right upper arm.
When posing the hypothetical questions to the vocational expert, the ALJ included *1116 all of the functional restrictions identified by Plaintiff's treating physicians and Dr. O'Day. No other limitations, specifically related to Plaintiff's decreased range of motion in his wrist and shoulder, were identified. Moreover, the court observes that Plaintiff worked at his factory job for over a year after the injury to his right forearm before eventually leaving work because of an injury to his back. This fact weighs against Plaintiff's assertion that residuals from the forearm injury prevent him from performing work-related activity.
Plaintiff argues that Dr. O'Day mentions a restriction related to his right arm. Pl.'s Br. at 14. This characterization is inaccurate. While Dr. O'Day found a slightly decreased range of motion in both the wrist and shoulder areas, he did not conclude that this limited Plaintiff's ability to perform work-related activity. Dr. O'Day's assessment of Plaintiff's abilities reads, in its entirety, as follows:
This gentleman lacks binocular vision and should avoid dangerous heights that are unprotected as well as dangerous machinery. I also feel that he can stand and walk a total of six to eight hours a day with normal rest periods. I feel that he can bend, stoop and crouch at least occasionally and that he can lift and carry 50 pounds at least on an occasional basis.
(Tr. 272.) Plaintiff's allegation that stiffness and tingling in his right arm render him disabled is not supported by Dr. O'Day's opinion. Finally, to the extent that the ALJ did not fully accept Plaintiff's allegations that he has difficulty moving his wrist and shoulder, the court has previously concluded that the ALJ properly discounted Plaintiff's subjective complaints of disabling pain and limitation. In light of the foregoing, the court finds the ALJ's description of Plaintiff's residual functional capacity to be supported by substantial evidence on the record as a whole.
The testimony of the vocational expert was based on the residual functional capacity defined above. Given that the VE's conclusion that Plaintiff was capable of performing assembly line work was based on a proper assessment of his RFC, the court finds substantial evidence supporting the conclusion that Plaintiff can perform his past relevant work. Although it is uncommon for vocational testimony to be taken at the fourth level of the sequential analysis, an ALJ can properly use the testimony of a vocation expert to determine whether a claimant is able to perform his or her past relevant work. See Walters, 998 F.Supp. at 1083. In this case, the testimony of the VE supports the ALJ's conclusion that Plaintiff has the residual capacity to perform his past relevant work as an assembly line worker.

Conclusion
It is the undersigned's belief that substantial evidence in the record as a whole supports the decision of the ALJ finding Plaintiff not disabled because he possessed the residual functional capacity to perform his past work as an assembly line worker, as this job is generally performed in the national economy. Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.
NOTES
[1] Pronation is the act of rotating the forearm in such a way that the palm of the hand faces downward when the arm is extended at a right angle to the body. Supination is the act of rotating the forearm such that the hand faces upward when the arm is extended. See Stedman's Medical Dictionary, 1438, 1706 (26th Ed.1995).
[2] A transient ischemic attack is a sudden focal loss of neurological function with complete recovery usually within 24 hours. A TIA is caused by a brief period of inadequate blood flow in a portion of the carotid or vertebral basilar arteries. See Stedman's Medical Dictionary, supra, at 167.
[3] Cardiomegaly refers to an enlargement of the heart. See Stedman's Medical Dictionary, supra, at 281.
[4] In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).
[5] Paresthesia describes an abnormal sensation, such as burning, pricking, or tingling. See Stedman's Medical Dictionary at 1300.
[6] Phacoemulsification is a method of emulsifying and aspirating a cataract with a low frequency ultrasonic needle. See Stedman's Medical Dictionary, supra, at 1338.
[7] It is observed that progress notes of Dr. Khayata, dated May 20, 1996, reflect a prior right shoulder injury. However, even on this date, the doctor's notes do not indicate that Plaintiff complained of any pain, stiffness or tingling in his right shoulder. There is no other reference in the record to a right shoulder injury.
[8] An earnings report reflects that Plaintiff made the following amounts for the years noted: 1996 ($3862); 1995 ($16,106); 1994 ($11,572); 1993 ($816); 1992 ($0); 1991 ($0); 1990 ($6507); 1989 ($1413); 1988 ($4594); 1987 ($4327); 1986 ($7080); 1985 ($4394); 1984 ($4485); 1983 ($7341); 1982 ($4058); 1981 ($11106); 1980 ($9635); 1979 ($10296); and 1978 ($12362). (Tr. 35.)
[9] The court observes that both the ALJ and Plaintiff, at times, do not specifically identify whether they are discussing the upper or lower right arm. There is some evidence of both a forearm injury and a possible right shoulder injury, as well as stiffness and a slight decreased range of motion in both areas. The evidence establishes that Plaintiff suffered severe fractures in his right forearm in 1994. He has some decreased range of motion in his wrist as a result of the injury, but told Dr. O'Day that he did not have any problems with fine manipulatory skills. (Tr. 269.) At the administrative hearing, Plaintiff also alleged problems with his right upper arm and shoulder. (Tr. 40, 42.) Examination by Dr. O'Day showed a slight restriction in Plaintiff's range of motion in this area. (Tr. 269-71.) However, none of his doctors have placed any specific restrictions on Plaintiff's ability to perform the functional demands of work related directly to either his forearm or his right shoulder.